**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JOSEPH BARTNICK,

                              Plaintiff,

          - v -                                    Civ. No. 1:11-CV-1120
                                                        (GLS/RFT)

CSX TRANSPORTATION, INC.

                              Defendant.

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

**MEMORANDUM-DECISION and ORDER**

Considering the contentious nature of discovery in this matter, it would not

come as a surprise that the issue regarding Bartnick's failure to provide an expert

report, consistent with the directive in FED. R. CIV. P. 26(a)(2)(A) & (B) for his

treating physician who intends to opine as to the permanency of his injuries, would

eventually devolve into yet another motion.  Indeed, on February 19, 2013, CSX

Transportation, Inc. (hereinafter "CSX") filed a Motion for Sanctions, pursuant to

FED. R. CIV. P. 37, seeking an order to preclude Bartnick from (1) claiming that the

injuries that he suffered are permanent, and/or (2) offering any expert testimony in

that regard, as well as seeking an extension of time to serve its medical disclosure and

any other relief that may be just and proper.  Dkt. No. 50, Def.'s Mot. for Sanctions,

dated Feb. 18, 2013.  Bartnick opposes the Motion.  Dkt. No. 51, Pl.'s Opp'n.  While

the Court permitted CSX an opportunity to file a brief Reply, Dkt. No. 55, it denied

Bartnick's request to file a sur-reply.[1]  Although this Court has addressed this very issue in other Decisions and Orders, *see* Dkt. No. 43, 46, and 48, and the parties' familiarity with the facts is presumed, nonetheless a history as to this matter would be indispensable.

## I.  CASE HISTORY

### A.  Complaint and Bartnick's Medical Treatment

Bartnick filed a Federal Employers' Liability Act (hereinafter "FELA") Complaint against his employer CSX.  Dkt. No. 1, Compl., dated Sept. 21, 2011. Bartnick alleges that on December 9, 2009, while walking across the company's parking lot, "[he] fell in an unmarked depression which was covered by un-shoveled snow and sustained a severe left ankle fracture."  *Id.* at ¶ 8.  Initially, Bartnick was treated by Dr. Kaushik Bagchi and it appears that he underwent two surgeries in which orthopedic hardware and screws were inserted into his ankle for stabilization.  *Id*. at p. 9; Dkt. No. 50-2, Lawrence R. Bailey, Jr., Esq., Decl., dated Feb. 19, 2013, at ¶ 4.

---

[1]  It has been quite evident throughout this litigation that personal animus has erupted between the litigators, the genesis of which this Court does not want to know.  Dkt. No. 43, Dec. & Order, dated Nov. 5, 2012, at p. 1, n.1.  Bartnick's Counsel sought to file a sur-reply because he took umbrage at what he perceived to be veiled slights directed at his personal and professional integrity and reputation.  Dkt. No. 54, Pl.'s Lt., dated Mar. 12, 2013.  In response, the Court issued a Text Order outlining our standard motion practice, advising that I would only consider the merits of the Motion and not any *ad hominem* or personal assailments, denying the request for a sur-reply, but stating that if a review of the submissions, particularly CSX's Reply, warranted a sur-reply, the parties would be so advised.  Dkt. No. 56, Text Order, dated Mar. 12, 2013.  After reviewing all of the submissions and determining that neither personal invectives nor new issues were raised, a sur-reply is not warranted.

For unknown reasons,[2] Dr. Bagchi discontinued treating Bartnick, so, on August 15, 2012, he sought further treatment from Dr. David J. Dixon, an orthopedic surgeon employed by Northeast Orthopedics.  *See generally* Dkt. No. 51-5, Pl.'s Expert Report, dated Nov. 1, 2012.  Succinctly, Dr. Dixon became Bartnick's treating physician, and on October 15, 2012, performed an arthrotomy on Bartnick's left ankle to remove bone fragments and the orthopedic hardware, as well as a "major synovectomy," and arthroscopic debridement.  *Id*. at ¶¶ 12-18.  Dr. Dixon continued to render treatment to Bartnick during his recovery period and opined that he could return to work at the "end of November/early December 2012."  *Id*. at ¶¶ 19-22.

In terms of disclosure, Bartnick's Counsel, pursuant to FED. R. CIV. P. 26(a)(2)(C), served a "Designation of Expert Opinion," that states

> Dr. Dixon is expected to testify that the surgery he performed will likely relieve a significant part of Mr. Bartnick's pain and that it will restore a significant portion of function to his left ankle.  Nevertheless, he believes that the numbness in Mr. Bartnick's left ankle is permanent and that Mr. Bartnick will never regain full feeling in the ankle.  Dr. Dixon also visualized arthritis at the break site and believes that Bartnick will develop permanent progressive arthritis at the break location that will become more painful as Mr. Bartnick ages, particularly with the use of the ankle.  There is a possibility that the arthritis will require future surgery although that cannot be said with certainty at this time. . . . Dr. Dixon believes that Mr. Bartnick will suffer from permanent stiffness . . . [and] that some pain and loss of motion in the ankle are permanent.

---

[2] CSX suggests that Dr. Bagchi refused to continue to treat Bartnick because he kept missing appointments for his surgery and treatment.  Dkt. No. 50-2, Lawrence R. Bailey, Jr., Esq., Decl., dated Feb. 19, 2013, at ¶ 5.

*Id*. at ¶¶ 23-24.

It is Dr. Dixon's opinion regarding the extent and degree of permanency and its prospective impact on damages that has generated this issue.

### B.  Pretrial Litigation and Discovery

On January 19, 2012, a Rule 16 Conference was held and a Uniform Pretrial Scheduling Order (hereinafter "UPTSO") setting, *inter alia*, the discovery deadline at October 19, 2012, was issued.  Dkt. No. 12.  When a case presents bodily injury and the existence of a treating physician is acknowledged, it is this Court's normal and routine practice to discuss and distinguish the various expert reporting requirements. Thus, in addition to setting dates for the UPTSO, other matters relevant to pretrial litigation were discussed, including advising the parties that if a treating physician is anticipated to testify as to permanency, a full expert report, pursuant to FED. R. CIV. P. 26(a)(2)(A) & (B), is required.  The Court makes it a point to advise litigants that it sits within the camp of courts that have concluded that opinions as to permanent injury necessitates the more detailed report under Rule 26(a)(2)(B).  Because of numerous discovery and litigation disputes, and the fact that expert reports had not been exchanged, the Court issued an Order amending the UPTSO setting, *inter alia*, the discovery deadline at January 30, 2013, and further requiring Bartnick to serve his expert report by November 1, 2012.  Dkt. No. 36, Text Order, dated July 30, 2012.

## C.  Decision and Order, dated November 6, 2012

Under Rule 26(a)(2)(C), "[u]nless otherwise stipulated or ordered by the court, if the witness is not required to proved a written report, this disclosure must state [] the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705 [] and a summary of the facts and opinions to which the witness is expected to testify." (emphasis added).  Whereas, Rule 26(a)(2)(A) and (B) require that when a witness is retained or specially employed to provide expert testimony, there must be a report that contains "(i) a complete statement of all opinions that the witness will express and the basis and reason for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case."

Notwithstanding the 2010 Amendments to Rule 26(a)(2) creating the less detailed report, there is no specific reference nor guidance as to how the various opinions from a treating physician should be captured.  For treating physicians, opinions can be readily gleaned from the medical reports that generally encompass

and expose the course of treatment and, thus, an abbreviated report makes sense. Generally speaking the parameters of that testimony are limited to the care and treatment of the patient.  But where the doctor is rendering an opinion based upon a reasonable degree of medical certainty, it would seem that the abbreviated report falls short of adequate disclosure.  When absent from the medical records, an inventive litigant could conceal a host of very critical opinions or analyses that require the accompanying standard of a reasonable degree of medical certainty, which would not be cured by the less detailed report.  Because permanency is rarely disclosed in medical records, an opposing party could be blindsided by an underdevelopment of the disclosure and the scientific basis upon which it rests.  And precisely for this reason, it is the standing order of this Court to require the much more detailed report so that all facts and opinions are known to the parties. *See accord, Robinson v. Suffolk Cnty. Police Dep't*, 2011 WL 4916709, at *1 (E.D.N.Y. Oct. 17, 2011) (requiring a rule 26(a)(2)(A) & (B) report where the treating physician may be testifying as to causation); *Lamere v. New York State Office of the Aging*, 223 F.R.D. 85, 89 (N.D.N.Y. 2004) ("It is indeed certain that a treating physician who has not complied with the reporting requirement of Rule 26(a)(2)(B), should not be allowed to render opinions outside the course of treatment and beyond the reasonable reading of the medical records.").

As noted above, *see* Part I.A., Bartnick's Counsel served a Rule 26(a)(2)(C) expert report indicating, among other things, that Dr. Dixon will be testifying to permanent injuries.  Because Bartnick failed to comply with this Court's directive regarding expert disclosure, on November 2, 2012, CSX filed a Letter-Motion seeking to compel an expert report pursuant to Rule 26(a)(2)(A) & (B), Dkt. No. 39, which Bartnick opposed, Dkt. No. 41.  After the matter was fully briefed, the Court issued a Decision and Order.  Dkt. No. 43, Dec. & Order, dated Nov. 5, 2012.

Without dwelling on the particulars of the November 6th Decision and Order, certain observations must be noted.  The Court found Dr. Dixon's opinions to be broad and sweeping, not narrowly tailored as Bartnick urged, and not the type of opinion found within medical records.  "Even the medical records presented . . . do not hint at the degree of permanency that Dr. Dixon is prepared to testify to with a reasonable degree of certainty."  Dkt. No. 43 at p. 4.[3]  Even though the Court reiterated that a full written report is required, the Court found the current report to be extensive enough to satisfy Rule 26(a)(2)(B)(i) and (ii), leaving only the elements of Rule 26(a)(2)(B)(iii),(iv),(v) and (vi) to be supplemented in order to comprise a complete report.

---

[3] In fact, the recent submission of additional medical reports confirm those deficiencies.  The records are barren of any discussion of a permanent injury, rather they reflect a successful recovery from his injury. *See* Dkt. Nos. 50-5, 51-3, 51-5, & 51-6.

### D.  Motion for Reconsideration

Rather than attempt to comply with the Decision and Order, Bartnick filed a Motion for Reconsideration.  Dkt. No. 44, Pl's Mot. for Reconsideration, dated Nov. 19, 2012.  Although the Court determined that this was not a proper Motion for Reconsideration, I made further observations relative to the expert reporting requirement.  Notwithstanding the 2010 Amendment to the Rule 26(a)(2),

> the minimal reporting requirement is not a license for a treating physician to meander about in rendering medical opinions that are not readily apparent from the medical records and treatment modalities. Opining that a patient will endure a permanent injury is a prime example of that misapprehension.  For that reason, as well as the authority granted to courts under Rule 26(a)(2)(C) - 'unless otherwise stipulated or ordered by the court' - this Court advised the parties that . . . a full expert report, pursuant to Rule 26(a)(2)(B), is required.

Dkt. No. 46, Dec. & Order, dated Dec. 6, 2012, at pp. 5-6.

The Court reiterated that Dr. Dixon was not precluded from testifying as to Bartnick's treatment but he is "restrain[ed] from opining as to permanency without further information relative to his expertise and presentation." *Id*. at p. 6.  Nor did the Court require that Dr. Dixon re-write the report: "Everything that was provided in the initial report can be incorporated 'verbatim' into an updated report." *Id*. (citing Dkt. No. 43 at pp. 4-5).  Because of the gravity of the matter however, and in light of CSX's overtures to resolve this matter, the Court delineated several reasonable and flexible options for Bartnick to explore: "(1) obtain and disclose the requisite information from

Dr. Dixon in a timely manner; (2) accept CSX's overture in resolving the issues; or, (3) obtain an expert report from another and more compliant expert." *Id*. at pp. 8-9. Lastly, retreating from previous pronouncements that no further extensions of the discovery deadline would be allowed, the Court agreed to amend the UPTSO. However, before an extension would be granted, a status report was required to be filed by December 14, 2012. *Id*. at p. 9.

### E.  December 10, 2012 Status Report

The parties met and conferred as recommended by the Court.  On December 10, 2012, a Status Report was filed noting a detailed agreement between the parties.  The more salient terms were (1) an acknowledgment that Dr. Dixon provided Bartnick's counsel with the relevant information and opinions; (2) Dr. Dixon would be bound by the supplemental disclosures; (3) a list of exhibits to be used as well as Dr. Dixon's qualifications, testimony, and compensation would be provided; (4) in the event Dr. Dixon does not provide the requested information, Bartnick would have "the option to provide an expert report opining specifically about permanency by January 31, 2013;" and (5) in any event, Dr. Dixon would be permitted to testify as to Bartnick's treatment "without expressing permanency opinions based upon the previous disclosure."  Dkt. No. 47, Status Rep., dated Dec. 10, 2012.  Based upon the Status Report, the UPTSO was amended again, extending the discovery deadline to April 30,

2013, setting specific dates for expert disclosures, and noting that "NO FURTHER EXTENSIONS WILL BE CONSIDERED." Dkt. No. 48, Sch. Order, dated Dec. 10, 2012.

## II.  CSX'S MOTION FOR SANCTIONS

In spite of the Court's previous Orders and the parties' Stipulation, an updated expert report as to permanency was not forthcoming on January 31, 2013.  Dkt. No. 50-2, Lawrence R. Bailey, Jr., Esq., Decl., dated Feb. 19, 2013, at ¶¶ 11 & 13. Because of these repeated failures to comply with the Court's Orders, CSX seeks, pursuant to FED. R. CIV. P. 37(b)(2)(A)(i) & (ii), to preclude Bartnick from introducing proof of permanency through Dr. Dixon's testimony.  Dkt. Nos. 50-1, Def.'s Mem. of Law, dated Feb. 19, 2013, & 50-2, Bailey Decl. at ¶ 12.

Bartnick opposes this Motion.  Dkt. No. 51, Pl.'s Mem. of Law.  Setting aside the redundancy of Bartnick's previously stated legal positions on this matter, which were denied, Bartnick argues that it is not his fault that the directed and stipulated report is not forthcoming as he has made every effort to comply.  *Id*. at p. 1.  The problem is that Dr. Dixon, who is not a retained expert, "simply will not produce the report" as required by the Court.  Bartnick lists, in detail, his on-going efforts to acquire Dr. Dixon's signature on the already prepared report and the summary of his previous testimony.  Dkt. No. 51-9, Earl Stanley Murphy, Esq., Decl.  Simply put,

*-10-*

Bartnick states that he "cannot control a treating physician, and other financial demands in this lost time case, make it economically unfeasible to engage a separate expert to address this diagnosis that was part of Dr. Dixon's original treatment." Pl.'s Mem. of Law at p. 1.   And, Bartnick further posits that excluding Dr. Dixon's testimony regarding permanency would create "extreme prejudice . . . over a procedural issue that is beyond his control." *Id*. at p. 2.   Lastly, Bartnick proposes that Dr. Dixon be allowed to provide all of the requested information and his relevant testimony by a deposition. *Id*.

### III.  Federal Rule of Civil Procedure 37

There are two provisions within FED. R. CIV. P. 37 which permit the rendering of sanctions.  If a party fails to comply with an order of discovery, the court may make such orders in regard to the failure, which may be just.   *See* FED. R. CIV. P. 37(a)(3)(A) & 37(b)(2)(A).[4]  Furthermore FED. R. CIV. P.  37(b)(2)(A) specifically permits another order to be levied for failure to obey a discovery order by: (1) designating facts to be taken as established for the purpose of the action; (2) refusing to allow a party to support or oppose claims or defenses or prohibit the introduction of evidence with regard to those matters; (3) striking pleadings or staying the

---

[4]  An incomplete disclosure "must be treated as a failure to disclose, answer, or respond." FED. R. CIV. P. 37(a)(4).

proceeding until the order is obeyed, or dismissing the action of the disobeying party; and (4) treating the failure to obey the order as contempt.  In addition thereto, the failing party may be directed to pay reasonable expenses including attorney fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.  FED. R. CIV. P. 37(d)(3).

Similarly, under FED. R. CIV. P. 37(b)(2)(c), if a motion, pursuant to Rule 37(a), is made to compel disclosure and it is granted, or the disclosure is provided after the motion is filed, the court shall award reasonable expenses incurred in making the motion, including attorney fees.  Nonetheless, despite this strong language, sanctions are not appropriate if the motion was filed without the movant first making a good faith effort to obtain the disclosure, or late disclosure was substantially justified, or circumstances make the award of expenses unjust.

The aim of a sanction is "1) to ensure that the offending party will not be able to profit from the failure to comply; 2) to provide a strong deterrence to the non-compliant party and to others in the public; and 3) to secure compliance with an order." *EverHome Mortg. Co. v. Charter Oak Fire Ins. Co.*, 2011 WL 4056043, at *2 (E.D.N.Y. Apr. 18, 2011) (quoting *Hudson v. IRS*, 2007 WL 2295048, at *7 (N.D.N.Y. Mar. 27, 2007)); *see also Cine Forty-Second St. Theatre Corp. v. Allied*

*Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979).

The imposition of sanctions under Rule 37 is within the discretion of the court. *Valentine v. Museum of Modern Art*, 29 F.3d 47, 49 (2d. Cir. 1994); *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 765 (2d. Cir. 1990); *LeGrande v. Adecco*, 233 F.R.D. 253, 256-57 (N.D.N.Y. 2005) (citing, *inter alia*, *Scott v. Town of Cicero Police Dep't*, 1999 WL 102750 (N.D.N.Y. Feb. 24, 1999)). "Before imposing sanctions the court may consider: (1) the history of the party's failure to comply with court orders; (2) whether the party violating the order was given ample time to respond; (3) the effectiveness of alternative sanctions; (4) whether the non-complying party was warned and given an opportunity to argue the impending sanctions; (5) the prejudice to the adversary caused by the failure to comply; (6) whether the document at issue would normally be readily obtainable; and (7) the extent of the party's personal responsibility." *Adelman v. Hobbie*, 2006 WL 2639359, at *3 (N.D.N.Y. Sept. 13, 2006) (citing, *inter alia*, *Momah v. Messina Mem'l. Hosp.*, 1998 WL 129045, at *5 (N.D.N.Y. Mar. 6, 1998)).

## IV. ANALYSIS

Most of the above factors do not inure to Bartnick's benefit. As indicated above, there is a history, albeit of several months duration, of efforts to gain Bartnick's compliance with Rule 26(a)(2)(A) & (B) and the Court's Orders. None of

those endeavors have succeeded.  In two Decisions and Orders, Bartnick was warned that a consequence of the very nature now sought could be a likely prospect. Reasonable options were proposed by both the Court and CSX, but Bartnick did not successfully avail himself of any of them, especially retaining a new medical expert. With a new medical expert, who is prepared to opine as to permanent injuries, the matter would be resolved.  Like all other discovery requirements set forth in Rule 26, the prerequisites of Rule 26(a)(2)(B)(i)-(vi) should neither be disregarded nor discounted.  Without a disclosure of Dr. Dixon's qualifications, lists of exhibits to be used, previous deposition and trial testimonies, his compensation, and his signature on the already prepared report prejudice would ensue to CSX.  But there is a moment of pause as to Bartnick's personal responsibility.

Bartnick lays the blame squarely at the feet of Dr. Dixon and argues that if the testimony is excluded, "it will only be because of Dr. Dixon's own unwillingness or inability to prepare a detailed narrative report."  Pl.'s Mem. of Law at p. 8.  Bartnick's Counsel's averments of his efforts to secure Dr. Dixon's compliance are uncontroverted.  *See generally* Murphy Decl.  Yet, Bartnick is not legally wed nor bound by Dr. Dixon's recalcitrance, and could quite readily hire another medical expert to provide the proof of permanency.  And this is the snag.  The true barrier to this happening is that Bartnick has decided that the cost/benefit of this proof is

"economically unfeasible" when considering the other financial demands of this litigation:

> [The claim] is not a career ending case and the total economic claims asserted in this case are just over $33,000 . . . . Under the circumstances, engaging and paying for a litigation expert specifically to address a very narrow part of the medical opinion already held by Dr. Dixon on top of the $6,500 already expended [on discovery] simply is not economically feasible.

Pl.'s Mem. of Law at pp. 7-8.

The Court is deeply troubled by this argument and the intimation that procedural rules should be set aside because of limited resources.

This is not a "lost time case" as Bartnick now suggests.  Bartnick is seeking both pecuniary and compensatory damages, of which damages for permanency could be decisive rather than marginal.  Establishment of a permanent injury has always figured largely in the computation of compensatory damages, and if it was not such a centerpiece in the pursuit of damages, why wouldn't Bartnick abandon "this very narrow part of the medical opinion" in light of the difficulties he is experiencing in securing the appropriate expert report.  As a reminder, Dr. Dixon is permitted to testify as to everything else.  Rather, proof of permanency is, or at least was, a critical linchpin in the damages Bartnick is seeking.  Bartnick had engaged a vocational rehabilitation counselor whose testimony would surely have contributed to the magnitude of damages, but because of Dr. Dixon's unwillingness to produce the

*-15-*

required report, he "has been forced to abandon this testimony." Pl.'s Mem. of Law at p. 7. Therefore, proof of permanent injuries, no matter how "narrow," is still worthwhile. Because the development of permanent injury would be vital here, and because Dr. Dixon's testimony to that effect would serve as a critical nexus to others who would have contributed to the comprehensiveness of such damages, Bartnick could easily resolve this matter by extending to and paying the prevailing market rate for such expert testimony to Dr. Dixon.[5] Ostensibly, Bartnick has taken a calculated risk to expend as few dollars as he can in order to recover the maximum amount of damages without bearing any other consequence. Moreover, Bartnick has not cited nor has this Court found any precedent concluding that an expert report should be waived because obtaining such report is not economically feasible.

The Court now turns to Bartnick's proposal that Dr. Dixon be deposed. By deposing the "good" doctor, Bartnick exhorts that the requisite information could be obtained at that time: "Defense counsel [would be] free to question him concerning when and how often he has testified as an expert witness and whether he has ever offered conflicting opinions concerning the permanency of post-traumatic arthritis."

---

[5] The Court does not accept the proposition that a treating physician who has been asked to testify at a deposition or at trial does not maintain some records of such events. Nor does the Court accept Bartnick's proffer that "[c]linicans are clinicians and it is not their business to catalog previous testimony or even to write reports." Dkt. No. 51, Pl.'s Mem. of Law at p. 8. It is a common feature of a doctor's practice to prepare reports for a variety of his patient's needs, and often doctors are retained to provide expert advice in an assortment of legal settings.

*Id*. at p. 9.  There are several problems with this suggestion.  First, if Dr. Dixon, who is described as a "clinician," has not maintained records regarding his publishing and testimonial history as Bartnick suggests, *see supra* note 5, then a deposition would serve little purpose.  Second, disclosure of such information prior to a doctor's deposition allows opposing counsel an opportunity to research such disclosure and to prepare to conduct a better informed and thorough examination; without it counsel would be conducting a meandering, fishing expedition, which also could be costly.  Remember also that there is a statutorily imposed time limit on the length of such deposition.  Fed. R. Civ. P. 30(d)(1).  Third, and more importantly, since the defense would have to bear the cost of the deposition, such a maneuver unfairly shifts the cost of obtaining this information to CSX.  Even if Dr. Dixon was compelled to testify at a deposition, and there is no assurance that would occur, CSX would have to pay the treating physician a reasonable fee.  *Badr v. Liberty Mut. Group, Inc*., 2007 WL 2904210, at *5 (D. Conn. Sept. 28, 2007) (citing, *inter alia*, *LaMere v. New York State Office of the Aging*, 223 F.R.D. at 92); *accord Nestler v. Charwells Dining Servs*., 2005 WL 2333458, at *2 (N.D.N.Y. Sept. 23, 2005) (finding, in its discretion, that a doctor should receive a reasonable hourly fee whether spending time reviewing documents, meeting with an attorney, or actually testifying).  Unless CSX is willing to embrace this proposal, the Court is not willing to impose it.

Although his motivation has been seriously questioned above, the Court cannot gainsay that Bartnick has intentionally and wilfully refused to provide such an expert report. Nor do the facts suggest that Bartnick has acted in bad faith. In fact, CSX never intimates that he has. Suspending his lack of fault for a moment, it would still be unreasonable, unfair, and prejudicial to allow Dr. Dixon to testify as to permanency without first meeting the requirements of Rule 26(a)(2)(B). The failure to provide such data is not harmless. Since Rule 37 does not require a showing of bad faith, *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006), the sanction of preclusion of this proof would be appropriate.[6]

## V.  CONCLUSION

Unless CSX is willing to accept Bartnick's overture to depose Dr. Dixon in order to obtain the information required under the Federal Rules,[7] or unless Dr. Dixon complies with this Court's Orders within the next fifteen (15) days, he will be allowed to testify only as to the course of treatment and is precluded from testifying as to permanency.

For the reasons stated above, it is hereby

---

[6] With that being said, however, the Court does not find that attorney fees or costs are warranted under these circumstances.

[7] If Bartnick would offer to be responsible for all of Dr. Dixon's reasonable fees, maybe CSX should consider his overture.

*-18-*

**ORDERED** that CSX's Motion for Sanctions, Dkt. No. 50, is **granted** consistent with this Decision and Order; and it is further

**ORDERED** that CSX shall serve its expert report within fifteen (15) days of the date of this Decision and Order, unless the parties agree to depose Dr. Dixon first. In that event, CSX's expert report shall be served fifteen days after said deposition.

**IT IS SO ORDERED**.

March 18, 2013
Albany, New York

_____
Randolph F. Treece
U.S. Magistrate Judge